UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Elsa Bruno,

      Plaintiff,

      v.                                    Civil Action No. 2:15-cv-163

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

      Defendant.

## OPINION AND ORDER
(Docs. 8, 10)

Plaintiff Elsa Bruno brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB). Pending before the Court are Bruno's motion to reverse the Commissioner's decision (Doc. 8), and the Commissioner's motion to affirm the same (Doc. 10). For the reasons stated below, Bruno's motion is DENIED and the Commissioner's motion is GRANTED.

## Background

Bruno was 55 years old on her amended alleged disability onset date of October 23, 2012. She completed school through the 10th grade and does not have a GED. She has past work experience as a cashier, a housekeeper, and a mail clerk. She lives in West Rutland with her second husband of approximately 15 years and has an adult son who lives in Connecticut. (AR 517.)

Bruno was born in Puerto Rico, and had an abusive and impoverished childhood. (AR 489, 517.) She was the second of her mother's nine children, each having a different father. (*Id.*) The family lived in the projects, relying on welfare. (AR 517.) Bruno has never met her father, and her stepfather abused her and her mother. (*Id.*; AR 489, 505–06.) She married and left home when she was about 16 years old. (AR 489, 517.)

Bruno suffers from chronic obstructive pulmonary disease (COPD) and carpal tunnel syndrome (CTS). She uses an inhaler and a nebulizer to control her COPD, but still wheezes and has trouble breathing when walking even short distances. (AR 136–38.) Against the advice of medical providers, and despite having COPD, Bruno continues to smoke cigarettes. (*See, e.g.*, AR 544.) Due to her CTS, Bruno has pain when grabbing things; her hands feel numb when she wakes in the morning; and she has pain in her wrists. (AR 133–35.) She also suffers from bipolar disorder. She is "continuously angry" and has difficulty getting along with people (AR 489), and she "feel[s] like everybody is talking about [her]" (AR 140). On a typical day, Bruno does not do much of anything: she "barely leave[s] the house" (AR 134) because she does not want to be around people (133–34); she goes out only to shop for "two or three things at a time" (AR 136) and to attend medical appointments (AR 134).

Bruno has a history of opiate drug abuse. She was admitted to Brattleboro Retreat for a six-day period of detoxification in May 2012 (AR 493–96), but relapsed soon after her discharge (AR 508). She has been convicted of multiple criminal charges, including parole/probation violations, drug charges, and prostitution; and she has had periods of incarceration, her most recent lasting one month. (AR 504, 518.)

2

In July 2012, Bruno filed an application for DIB alleging that, starting on July 31, 2009[1], she has been unable to work due to bipolar disorder, depression, and varicose veins. (AR 163, 269.) Her application was denied initially and upon reconsideration, and she timely requested an administrative hearing. The hearing was conducted on April 21, 2014 by Administrative Law Judge (ALJ) Thomas Merrill. (AR 129–48.) Bruno appeared and testified, and was represented by an attorney. A vocational expert (VE) also testified at the hearing. On May 6, 2014, the ALJ issued a decision finding that Bruno was not disabled under the Social Security Act from her amended alleged disability onset date through the date of the decision. (AR 101–09.) Thereafter, the Appeals Council denied Bruno's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–5.) Having exhausted her administrative remedies, Bruno filed the Complaint in this action on July 15, 2015. (Doc. 1.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that

---

[1] In April 2014, Bruno amended her alleged disability onset date to October 23, 2012. (AR 240.)

3

impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Bruno had not engaged in substantial gainful activity since her amended alleged disability onset date of October 23, 2012.  (AR 103.)  At step two, the ALJ found that Bruno had the severe impairments of chronic obstructive pulmonary disease (COPD) and carpal tunnel syndrome (CTS).  (*Id.*)  Conversely, the ALJ found that Bruno's bipolar disorder and

4

varicose veins were not severe.  (*Id.*)  Regarding the bipolar disorder, the ALJ explained: "While [Bruno's] symptoms seem to cause functional limitations, this is attributable to [her] non-compliance with medication to try to obtain disability benefits."  (AR 104 (citing AR 539).)  Moreover, the ALJ found that Bruno's bipolar disorder "causes only mild limitations in functioning."  (AR 104.)  At step three, the ALJ found that none of Bruno's impairments, alone or in combination, met or medically equaled a listed impairment.  (AR 106.)  Next, the ALJ determined that Bruno had the RFC to perform "medium work," as defined in 20 C.F.R. § 404.1567(c), except "she can only frequently handle objects."  (*Id.*)  Given this RFC, and relying on testimony from the VE, the ALJ found that Bruno was capable of performing her past relevant work as a cashier, a housekeeper, and a mail clerk.  (AR 109.)  The ALJ concluded that Bruno had not been under a disability from her amended alleged disability onset date of October 23, 2012 through the date of the decision.  (*Id.*)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## **Analysis**

Bruno argues that the ALJ's RFC determination is "not supported by substantial evidence and is the product of legal error." (Doc. 9 at 14.) Specifically, Bruno asserts that the ALJ failed to account for her nonexertional limitations resulting from her affective disorders. This argument is based on Bruno's contention that the ALJ erred in his analysis of the medical opinions. In response, the Commissioner asserts that the ALJ properly

6

weighed the medical evidence and adequately accounted for Bruno's physical and mental impairments. As explained below, the Court agrees with the Commissioner and finds that the ALJ's decision applies correct legal standards and is supported by substantial evidence.

## I.     Opinions of Non-Examining Agency Consultants Dr. Harris and Dr. Patalano

Bruno contends that the ALJ mischaracterized the opinions of non-examining agency psychological consultants Therese Harris, Ph.D. and Joseph Patalano, Ph.D., by stating that they limited Bruno to "'unskilled work.'" (Doc. 9 at 15 (quoting AR 145–46); *see* AR 105.) Bruno points out that Drs. Harris and Patalano did not merely limit Bruno to "unskilled work"; they also assessed moderate limitations in maintaining attention and concentration for extended periods, and working in coordination with or in proximity to others; and they found that Bruno was limited to maintaining focus, pace, and persistence for only two-hour periods. (Doc. 9 at 15–16.)

In October 2012, after reviewing the medical evidence, Dr. Harris opined that Bruno had mild restrictions in activities of daily living; moderate difficulties in concentration, persistence, and pace; and moderate difficulties in social functioning. (AR 156.) Dr. Harris further opined that Bruno was moderately limited in her ability to: maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, "complete a normal workday and workweek without interruptions from psychologically based symptoms," and "perform at a consistent pace without an unreasonable number and length of rest periods." (AR 158.) Dr. Harris explained that Bruno's difficulties in sustaining focus and concentration would

result in her being able to maintain focus, pace, and persistence for only simple tasks and for only two-hour periods. (*Id.*) About two months later, in December 2012, Dr. Patalano expressed opinions consistent with those of Dr. Harris. (AR 170, 173.)

The ALJ did not give a specific weight to the opinions of either Dr. Harris or Dr. Patalano. Rather, the ALJ accurately stated that, despite these opinions, "Dr. Harris noted [in her report] that providers noted [Bruno's] possible malingering and malingering." (AR 105 (citing AR 154).) The ALJ also accurately stated that "Dr. Patalano noted that [Bruno] was not taking medication because she would be denied Social Security benefits if [it] worked." (AR 105 (citing AR 168, 539).) It was appropriate for the ALJ to consider these factors in assessing Bruno's credibility and determining the weight of the non-examining consultants' opinions. Moreover, the record supports the ALJ's findings: in summarizing the medical evidence, Dr. Harris stated: "poss[ible] malingering," "poss[ible] . . . malingering due to vagueness and volume of s[ymptom]s," and "malingering." (AR 154.) Additionally, both Dr. Harris and Dr. Patalano stated that Bruno's allegations were only "partially credible" and that the severity of her alleged impairments was "disproportionate to that supported by the objective medical findings." (AR 159, 174.)

The ALJ did not err by considering Bruno's credibility and compliance with treatment recommendations in conjunction with his analysis of the non-examining psychological consultants' opinions. The applicable regulation states that "if [the claimant] do[es] not follow the prescribed treatment without a good reason," he or she will not be found disabled. 20 C.F.R. § 404.1530(b). And the Social Security Administration

has determined that a claimant's statements "may be less credible if . . . the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p, 1996 WL 374186, at *7 (July 2, 1996); *see* SSR 82-59, 1982 WL 31384, at *2 (1982) ("continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits"). In *Dumas v. Schweiker*, the Second Circuit affirmed the denial of benefits to a claimant who failed to heed his examining physicians' diet recommendations which would have helped his hypertension and headaches. 712 F.2d 1545, 1553 (2d Cir. 1983); *see also Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983). Noting that the claimant's physicians "were frustrated by [the claimant's] unwillingness to help himself," the Second Circuit stated: "Of course, a remediable impairment is not disabling." *Dumas*, 712 F.2d at 1553; *see also Calabrese v. Astrue*, 358 F. App'x 274, 277–78 (2d Cir. 2009) (in assessing claimant's credibility, ALJ properly considered, among other things, that claimant "took no prescription-strength pain medication despite her contention that she constantly experienced [severe] pain . . . [and] was noncompliant in taking the medication that was prescribed by her doctors").

Moreover, it is for the Commissioner, not the court, to assess a claimant's credibility and resolve factual inconsistencies. *See Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). If the ALJ's credibility assessment is supported by substantial evidence, the court must uphold it, even if substantial evidence supporting the claimant's position also exists. *Id.*; *see Alston*, 904 F.2d at 126 ("Where there is

9

substantial evidence to support either position, the determination is one to be made by the factfinder."). Here, substantial evidence supports the ALJ's assessment that Bruno was not fully credible and failed to comply with treatment recommendations. For example, regarding Bruno's credibility, examining consultant Dean Mooney, Ph.D., stated as follows: "There is a possibility of malingering here (which is supported by documentation) due to the vagueness and volume of her symptoms." (AR 519.) And examining psychologist Joseph Rainville, Psy.D. indicated that Bruno had a test score "strongly suggest[ing] the possibility of malingering," which was supported by: "[Bruno's] request for documentation in order to gain a disability," the "vagueness" and "sheer volume" of Bruno's symptom presentation, and "[Bruno's] lack of follow-through in therapeutic interventions and the time interval in between [those interventions]." (AR 490.) Dr. Rainville stated that Bruno exhibited "a strong tendency to magnify illness and complaints." (*Id.*)

Regarding Bruno's failure to comply with treatment recommendations, treating nurse Brandi Rand, APRN, noted that Bruno took Wellbutrin "only when she remembers," despite Nurse Rand telling her "several times" that "this was not an acceptable way to be taking the Wellbutrin" and that Bruno should take it daily. (AR 539.) Nurse Rand stated: "[Bruno] indicates that she can't work and that if she takes the Wellbutrin every day and it works[,] then she will be denied Disability." (*Id.*) In another treatment note, Nurse Rand questioned the accuracy of Bruno's statement that she was taking Wellbutrin and stated

that Bruno "does not appear invested in treatment."[2] (AR 357; *see* AR 563 ("[s]till not taking the Wellbutrin daily as prescribed").) The ALJ's decision reveals that he considered these factors–Bruno's tendency to malinger and failure to comply with treatment recommendations–in analyzing the opinions of Drs. Harris and Patalano. (AR 105.)

Furthermore, Bruno's assertion that the ALJ "failed to accurately portray the opinions of Drs. Harris and Patalano during his colloquy with the VE" at the administrative hearing (Doc. 9 at 15), lacks merit. The ALJ included a limitation for "unskilled work" in the relevant hypothetical to the VE, and the VE testified that an individual who could do only "unskilled jobs" could do Bruno's past relevant work as a cashier, housekeeper, and mail clerk. (AR 145–46.) Despite Bruno's argument to the contrary, a limitation to "unskilled work" largely accounts for the limitations assessed by Drs. Harris and Patalano. *See* Social Security Ruling (SSR) 85-15, 1985 WL 56857, at *4 (1985) ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."). Notably, "unskilled work" does not

---

[2] Although not relevant to Bruno's mental impairments, the record also indicates that Bruno failed to comply with treatment recommendations regarding her COPD by continuing to smoke cigarettes despite her medical providers advising her to stop. (*See* AR 417 ("[s]he is a smoker and has been given a pamphlet and encouraged to quit"); 540 ("intermittently smoking heavily"); 544 ("not willing to stop [smoking] at this point"), 615 ("continues to smoke"), 664 ("smoke[s] two packs a day[;] she is encouraged to quit").) For example, in December 2013, Dr. Kenneth Mar wrote in a treatment note: "Again, I advised [Bruno] to stop smoking. I stressed . . . that her respiratory status is deteriorating and will never improve unless she stops smoking." (AR 616; *see also* AR 626, 638, 641.)

require alertness or close attention, *see* 20 C.F.R. § 404.1568(a)–(b), and Drs. Harris and Patalano agreed that Bruno could maintain focus, pace, and persistence for two-hour periods. (AR 158, 173.)

## II.   Opinions of Examining Consultant Dr. Mooney

Next, Bruno contends the ALJ erred in "utterly ignor[ing]" the opinions of examining psychological consultant Dr. Mooney. (Doc. 9 at 16.) In September 2012, Dr. Mooney performed a mental status examination of Bruno. (AR 516.) Based on that examination, Dr. Mooney diagnosed Bruno with bipolar disorder, most recent hypomanic, with rapid cycling; cannabis abuse; opioid dependence, early partial remission; and personality disorder not otherwise specified. (AR 519.) Dr. Mooney opined that the prognosis for Bruno's mental health condition was "poor." (*Id.*) He stated, however, that "documentation" indicated that Bruno may have been "malingering" "due to the vagueness and volume of her symptoms." (*Id.*) Dr. Mooney concluded that Bruno's prognosis was "contingent on her receiving treatment." (AR 520.)

Bruno is correct that the ALJ did not discuss the opinions of Dr. Mooney in his decision. But "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted). And here, as discussed above, the ALJ did consider the opinions of Dr. Harris, and in those opinions, Dr. Harris considered the opinions of Dr. Mooney. (*See* AR 105, 108, 151, 154–55.) Moreover, ALJs are not required to discuss every medical opinion in the record, particularly those of non-examining medical consultants. *See Brault*, 683 F.3d at 448 ("[a]n ALJ does not have to

12

state on the record every reason justifying a decision" and "is not required to discuss every piece of evidence submitted") (internal quotation marks omitted); *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983) (although courts may not accept "an unreasoned rejection of all the medical evidence in a claimant's favor," the Commissioner need not "reconcile explicitly every conflicting shred of medical testimony").

Furthermore, the ALJ's decision is largely supported by Dr. Mooney's report, which states, for example, that Bruno quit her job as a housecleaner because "she 'didn't feel like working,'" and that Bruno was able to "tend[] to the cleaning" around the house and "prepare[] light meals for herself." (AR 517.) Dr. Mooney noted that an August 2011 psychological evaluation indicated that Bruno "was reported to be . . . mistrustful[] and engage[] in contradictory behaviors," and that testing suggested "the possibility of malingering and was supported by a request of documentation in order to gain disability." (AR 518.) Despite finding that Bruno presented as angry with a hostile tone and "cried through most of the evaluation," Dr. Mooney found that Bruno's thought processes were logical and goal-directed; she displayed no evidence of psychosis or severe thought disturbance; she was fully oriented; and she had adequate memory, and sound attention and concentration. (AR 516.) Dr. Mooney further found that Bruno's cognitive ability, judgment, and impulse control were "sufficient." (AR 519.)

### III.   Opinions of Treating Psychiatrist Dr. Golin

Finally, Bruno claims the ALJ erred in his analysis of the opinions of her treating psychiatrist, Lorri Golin, M.D. Dr. Golin treated Bruno from August 2008 through

13

November 2009, and then again starting in April 2013. (AR 562, 567.) In May 2013, Dr. Golin provided a Medical Capacity Assessment of Bruno, wherein she opined that Bruno had moderate to marked limitations in understanding and memory; moderate to extreme limitations in sustaining concentration and persistence; slight to marked limitations in social interaction; and slight to marked limitations in adaptation. (AR 570–72.)

The ALJ was required to analyze Dr. Golin's opinions under the Second Circuit's "treating physician rule," given her status as Bruno's treating psychiatrist during the relevant period. Under that rule, a treating source's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well[]supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993). The deference given to a treating source's opinion may be reduced, however, in consideration of other factors, including the length and nature of the treating source's relationship with the claimant, the extent to which the medical evidence supports the treating source's opinion, whether the treating source is a specialist, the consistency of the treating source's opinion with the rest of the medical record, and any other factors "which tend to . . . contradict the opinion." 20 C.F.R. § 404.1527(c)(2)–(6); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). If the ALJ gives less than controlling weight to a treating source's opinion, he must provide "good reasons" in support of that decision. *Burgess v. Astrue*, 537 F.3d 117, 129–30 (2d Cir. 2008).

14

Here, the ALJ afforded "no probative value" to Dr. Golin's opinions (AR 104), and stated that he gave them "little weight" (AR 105). The ALJ provided the following reasons in support of these findings: (a) Dr. Golin's opinions "ha[ve] no support in the medical record" (AR 104), including in her own treatment notes (AR 105); (b) there was a large gap in Dr. Golin's treatment of Bruno, from approximately 2008 until 2013 (*id.*); and (c) Dr. Golin's treatment notes reflect Bruno's "disability conviction, making the opinions of her mental condition not reliable" (*id.*). As discussed above, these were proper factors to consider in assessing the value of Dr. Golin's opinions. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion"); *id.* at (c)(2)(ii) ("the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion"); *id.* at (c)(3) ("[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion"); *id.* at (c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion"). Bruno asserts that the ALJ gave only a "single reason"—the gap in treatment—for discounting Dr. Golin's opinions (Doc. 9 at 19), but this argument fails on both the facts (*see* AR 104–05, discussed above) and the law, given that the Second Circuit does not require "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation[s] are clear." *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31–32 (2d Cir. 2004)).

15

Moreover, the ALJ supported his finding that Dr. Golin's opinions are inconsistent with the medical evidence by accurately citing to the medical record, which includes ample documentation of Bruno's normal or only mildly abnormal mental health examinations. (*See* AR 104–05, 357 (although "irritable" and insight "poor," "alert and attentive," "[c]ooperative and reasonable," and "goal directed"), 417 ("Alert and oriented," "Cooperative"), 424–28, 433, 440–44, 461, 465 (although "anxious," "alert and oriented x 3 with no impairment of recent or remote memory, normal attention span and ability to concentrate"), 472, 477 (although "Anxious," "Alert," "Cooperative[,] and Well Appearing"), 647, 659, 741 ("Cooperative attitude," "Goal directed" thought form, and "Intact" insight and judgment).) The ALJ explained as follows: "[Bruno's] mini mental status exams conducted during routine physical evaluations . . . report only mild mental health symptoms. . . . Her mental health treatment notes report that she is consistently fully oriented, with adequate hygiene, alert and cooperative behavior, and normal thought process." (AR 104 (citing AR 356–96, 413–81, 522–45, 558–69, 574–611, 615–65, 741–43).) The ALJ was entitled to consider the lack of evidence demonstrating severe mental limitations in assessing the weight of Dr. Golin's opinions. *See Dumas*, 712 F.2d at 1553 ("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say."). The ALJ also properly considered that Bruno's mental health symptoms were affected by her "non-compliance with medication to try to obtain disability benefits," as discussed above. (AR 104 (citing AR 539).)

## **Conclusion**

Although the ALJ's RFC determination and relevant hypothetical to the VE do not match any particular medical opinion in this case, it was proper for the ALJ to weigh the evidence as a whole in determining these issues.  *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").  Because the ALJ did not make a legal error and substantial evidence supports his decision, the decision is not disturbed.  Accordingly, the Court DENIES Bruno's motion (Doc. 8), GRANTS the Commissioner's motion (Doc. 10), and AFFIRMS the decision of the Commissioner.

Dated at Burlington, in the District of Vermont, this 5th day of July, 2016.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge